(35 App. Div. 312.)

## CLARK et al. v. DURLAND.

(Supreme Court, Appellate Division, Second Department. December 6, 1898.)

1. TRESPASS—INJUNCTION—BURDEN OF PROOF.
    In an action to restrain a trespass by one claiming title to the property in question, the plaintiff, to establish his right, must rely on the strength of his own title, and not on the weakness of defendant's.

2. SAME—QUESTION OF FACT.
    The question of the sufficiency of plaintiff's title to entitle him to an order restraining an adverse claimant from trespassing is one of fact, on which the finding of the trial court is conclusive, unless the error therein is affirmatively shown.

3. DEEDS—DESCRIPTION.
    A deed conveyed "all of that certain other lot of land, * * * bounded and described as follows" (describing the line as running "thence across said pond"); the tract conveyed "containing four hundred and fifteen $13/100$ acres, and deducting therefrom $8\,70/100$ acres for land covered by the waters of W. pond, leaving four hundred and six $41/100$ acres of land." The owners of the tract conveyed had, both before and after the transfer, for a long series of years, used the waters of the pond included therein. *Held*, that the deduction of the land covered by water was merely for computation, and the courses and distances controlled, so that the deed conveyed the land covered by the waters of the pond.

4. QUITCLAIM DEED—INTEREST CONVEYED.
    A quitclaim deed to the same property which had been deeded to the vendor, given after a portion of the property so deeded had been conveyed by such vendor, conveys only the interest which the vendor had remaining in the property.

Appeal from special term, Orange county.

Action by Elizabeth Clark and another against Jesse Durland. Judgment for plaintiffs, and defendant appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, and WOODWARD, JJ.

M. N. Kane (John J. Beattie, on brief), for appellant.

Harrison W. Nanny (S. W. Fullerton, on brief), for respondents.

WOODWARD, J.    The plaintiffs in this action are the owners of a farm on the north side of Wickham's pond (formerly Perry's pond), in the town of Warwick, county of Orange; the defendant is the owner of a farm on the southwest side of the same pond; and this action is brought for the purpose of restraining the defendant from cutting ice and otherwise trespassing upon the lands covered by the waters of this pond, the plaintiffs claiming to own the said lands.    Both parties assert title from the Wawayanda patent, granted to 12 patentees by Queen Anne in 1703; and, as the burden is upon the plaintiffs to show the right to the injunction granted by the trial court by the strength of their own title, rather than by the weakness of the title of the defendant, it is important to examine the chain of title as finally presented to the court below, that we may determine whether the judgment should stand.    Keeping in mind the rule laid down by Mr. Justice Cullen in the case of Deuterman v. Gainsborg, 9 App. Div. 151, 41 N. Y. Supp. 185, that the question is one solely of fact, "and while it is a question of fact not arising from conflicting statements of witnesses, but from inferences from written documents, we think the same rule applies to its determination by the trial court as applies to other questions of fact; that is to say, this division of the court is not justified in reversing the determination of the trial court, unless it affirmatively appears that the trial court clearly erred in its decision,"—we will take up the question of the title to the property in dispute as presented by the plaintiffs.

The title to the farm now owned and occupied by the plaintiffs does not proceed from the same source as their alleged title to the pond, and it is important that this fact should be kept in mind in considering this question.    It is conceded that the first conveyance of the property in dispute, after the granting of the patent, was made by Abraham Hasbrouck and others, as commissioners appointed to apportion the property of the grant among the several owners, and to appropriate enough to pay for the expense of the survey and division, and that the property so conveyed consisted of what was known as the "Expense Lot," containing 2,064 acres, including the pond now in dispute.    This property was sold by the commissioners to John Wisner at public auction.    At the time of this sale, William Wickham was interested in the property, by reason of an agreement between himself and the said John Wisner; and on the 8th day of September, 1766 (about three months after the sale above mentioned), the said John Wisner conveyed by deed to the said William Wickham a one-third part of the Expense lot, of 2,064 acres, which was described as "containing the whole of Perry's pond," and which embraced a considerable part of the land now concededly owned and occupied by the defendant,

who traces his title, to the land to the same source. In a deed from John Wisner to Henry Wisner, 3d, dated July 20, 1771, lands "along the said pond" were conveyed, and it may be that the defendant, who is the successor in title, thus became the owner of the lands under water to the center of the pond; but it is not necessary to consider this branch of the question. From the date of the deed from John Wisner to William Wickham to the death of George D. Wickham, son of William Wickham, in 1845, there is no evidence of a conveyance of Perry's pond, with the possible exception above mentioned, though the defendant's predecessors in title appear to have had free access to the pond, both for the purpose of watering their cattle and for boating and fishing. William Wickham died about 1814, and the title to his real estate passed to his son George by will. George D. Wickham died about the year 1845, leaving a last will and testament, of which George F. Tallman and Ambrose S. Murray were appointed the executors, who were empowered to sell and convey his real estate. In 1848 these executors conveyed "all that tract of land situate in the, town of Warwick aforesaid, called 'Wickham's Pond,' and the lands adjoining the same," to Bridget Wickham. The said Bridget Wickham in May, 1849, conveyed the greater part of Wickham's pond to William F. Clark, the father and testator of the plaintiffs, to whom the same was devised. In the November following she conveyed the remaining portion of Wickham's pond to Mary Ann Wisner. In June, 1881, the said Mary Ann Wisner, having in the meantime married the father of the defendant, conveyed to A. Ruggles Holbert that portion of Wickham's pond which she held under the deed of Bridget Wickham, and in 1892 the said Holbert conveyed his title to the plaintiffs. If this chain of title was not interrupted, we should be free to acquiesce in the judgment of the trial court; but it appears from the evidence in the case that Mary Ann Wisner (widow of Henry B. Wisner, who concededly held the title to the farm now owned by the defendant), who took title from Bridget Wickham to that portion of the Wickham pond not conveyed to William F. Clark, gave a deed of all her interest in the farm, as well as to a certain portion of the tract of land under water, to her children, in May, 1863. These children (Elizabeth, Phebe, and Mary) took title to the premises under the will of Henry B. Wisner, subject to the dower right of Mary Ann Wisner; and after the marriage of Mary Ann Wisner to Thomas E. Durland, father of the defendant, and on the day on which Mary Ann Wisner (Durland) made her deed to her daughters, these daughters joined with their husbands in a sale of the premises for a consideration of $23,675 to Thomas E. Durland. The property conveyed consisted of one plot, of about 159 acres, lying along the southeast shore of the pond, and which was bounded "along the east shore of said pond," "and also all that certain other lot of land, situated in said town of Warwick, bounded and described as follows, viz.: Beginning at a stake drove in the center of the outlet ditch of Wickham's pond, being the northwest corner of the lands of Mills Bradner; thence, along said Bradner's land and lands of Martin Brooks and George Pitts, south, thirty-two degrees and thirty minutes east, fifty-seven chains and forty-five links, to a swamp wood lot of Smith Benedict; then, along his land and

lands of others, south, sixty-seven degrees and thirty minutes east, thirty-seven chains and sixty-three links, to a stake and stones put up in the line of lands of William H. Wisner; then, along his lands, north, twenty-two degrees and fifteen minutes east, three chains and forty-four links, to a stake and stones; thence south, seventy-nine degrees east, eleven chains and forty-five links, to a hickory tree cornered; thence north, sixteen degrees east, twenty-five chains and seventy-five links, to a stake; thence north, seventy-nine degrees and forty-five minutes west, fourteen chains and sixty-three links, to a stake; thence north, thirteen degrees and thirty minutes west, thirty chains and forty-three links, to a cedar stake set on the east bank of Wickham's pond; thence, across said pond, north, eleven degrees and fifteen minutes west, seventeen chains and thirty-seven links, to a stake set about two feet east from a maple tree; thence north, fifteen degrees west, seventeen chains and sixty links, to the center of the Warwick Railroad; thence, along the center of the same, south, sixty-eight degrees and fifteen minutes west, twenty-seven chains and sixty-two links; thence south, sixty-five degrees west, eleven chains and thirty-four links, to a stake drove in the center of the aforesaid railroad; thence south, fourteen degrees and forty-five minutes east, five chains and sixty-two links, to a stake in the east bank of the outlet ditch of Wickham's pond; thence, along the same, south, seventy-three degrees and thirty minutes west, seven chains and sixty-nine links, to a stake; thence north, fourteen degrees and forty-five minutes west, twenty-five links, to the center of said ditch; thence, along the center of said ditch, south, seventy-three degrees and thirty minutes west, six chains and twenty links, to the place of beginning,— containing four hundred and fifteen $^{13}/_{100}$ acres, and deducting therefrom 8 $^{70}/_{100}$ acres for land covered by the waters of Wickham's pond, leaving four hundred and six $^{41}/_{100}$ acres of land."

At this time (May 4, 1863) Mary Ann Durland was the owner of the portion of the pond conveyed in the above description, and the title she conveyed to her children. These children duly conveyed that title to Thomas E. Durland, unless the last clause quoted above is held to be an exception to the grant. The grantors, for and in consideration of $23,675, undertook to convey, not the lands above water, but "all that certain other lot of land situated in said town of Warwick, bounded and described as follows." The deed then proceeds to bound and describe the farm, "containing four hundred and fifteen $^{13}/_{100}$ acres," with the line running across the lake. Without any words indicating an intention to limit the grant of the "four hundred and fifteen $^{13}/_{100}$ acres," it is mentioned, by way of calculation, "and deducting therefrom 8 $^{70}/_{100}$ acres for land covered by the waters of Wickham's pond, leaving four hundred and six $^{41}/_{100}$ acres of land." That this was not intended to be excepted from the grant is clearly indicated by the language of the conveyance, which, in the very next sentence, declares that the grant is "subject, nevertheless, to such right of uses and passage over the said lot of land as is now legally vested in the Warwick Valley Railroad Company, which is hereby expressly excepted and reserved to the said railroad company, their successors and assigns." The same accuracy of expression is also

found in the conveyance of the first parcel under this deed, where, after the description of the lot, "containing one hundred and fifty-nine acres and eighteen hundredths of an acre of land, more or less," the following exception is made: "Excepting and reserving therefrom a lot called the 'Ash Swamp Lot,' adjoining the lands of Samuel Monell, containing about nine acres of land." The deed throughout bears evidence of having been drawn with an intelligent appreciation of the use of language, and the deduction clause is to be understood merely as a calculation as to the amount of dry land contained within the bounds given.

As was said in the case of Hathaway v. Power, 6 Hill, 453, where the deed called for 160 acres, and it was found that the lot, as described, contained 185 acres:

"They intended to transfer, moreover, not merely a right to select a given number of acres out of a larger tract, but the particular piece of land which the deed assumes to describe. The subject-matter is declared to be a 'certain tract or parcel of land,' and 'all' of that tract or parcel. And, such being the intent expressed by the deed, every word contained in it should be understood as designed to carry that intent into effect." "But," continues the court in the same case, "there are other rules of construction which should not be overlooked. This being a deed poll, it should be construed most strongly against the grantors. The words used are to be deemed their words, and, if equivocal, that shall not benefit the parties using them. * * * 'In a deed, if there be two clauses so totally repugnant to each other that they cannot stand together, the first shall be received, and the latter rejected.' Shep. Touch. (Preston's Ed.) 88. That which is most material and most certain in a description shall control that which is less material and less certain. Doe v. Thompson, 5 Cow. 373; Newsom v. Pryor, 7 Wheat. 10; Jackson v. Wendell, 5 Wend. 147."

In applying this latter rule in the case of Newsom v. Pryor, supra, Chief Justice Marshall says:

"As in this case, the second line is to run south 894 poles, to a stake, crossing the river. This distance will not reach the river, and must be continued to 1,222 poles, to cross the river. The distance must be disregarded, and this line so extended as to cross the river, or the distance must control the call for crossing the river. These difficulties have occurred frequently, and must be expected to occur frequently where grants are made without an actual survey. * * * The courts of Tennessee, and all other courts by whom causes of this description have been decided, have adopted the same principle, and have adhered to it. It is, that the most material and most certain calls shall control those which are less material, and less certain. A call for a natural object, as a river, a known stream, a spring, or even a marked tree, shall control both course and distance. These decisions are founded on two considerations. Generally speaking, it is the particular intention of the purchaser to acquire the land lying on the stream called for, as being more valuable than other land," etc.

The call in the deed under which defendant's father acquired title to his possession was to cross the pond; and, as it appears from the evidence that the owners of the Wisner-Durland farm had for a long series of years been using this pond as a source of supply for ice houses, and for fishing and boating, it may be fairly assumed that Thomas E. Durland purchased with this end in view, and that his grantors, being the owners of the property, intended to convey all that they owned. "The deed," say the court in the case of Blackman v. Striker, 142 N. Y. 555, 37 N. E. 484, "must be held to convey all the interest in the

lands which the grantor had, unless the intent to pass a less estate or interest appears by express terms, or be necessarily implied in the terms of the grant." The land under water was of no use to the grantors. They did not reserve to themselves any right of way over the premises which they conveyed, and there is no reason to think that they had any means of access to the land without becoming trespassers, while the amount of the consideration would indicate clearly that the purchaser intended to secure to himself all beneficial interest in the property. "An exception or reservation in a deed," say the court in the same case, "is to be taken most favorably to the grantee, and, if there is uncertainty or ambiguity in the language, he should have the benefit of the doubt or the ambiguity. They should be taken most strongly and construed most strictly against the grantor, whose words they are, and against him who stands in his place; and, if an advantage can be gained from an uncertainty or ambiguity in the words, the grantee, or person standing in his place, is entitled to the benefit of it." With these rules in mind, we are unable to find any theory on which the clause, "and deducting therefrom," etc., can have the effect of limiting the interest purchased by the grantee in the deed to Thomas E. Durland. Such a reservation could be of no use to the grantors, unless to embarrass the grantee; and, in the absence of certainty in the language, it would be a perversion of justice to give effect to such a motive.

Thomas E. Durland having been seised of the fee to that part of Wickham's pond lying west of the line passing through the pond, and embracing an area of something over eight acres, we are unable to agree with the eleventh finding of fact by the trial court:

"That thereafter the said Mary Ann Wisner, having become by marriage Mary Ann Durland, did, by the last-mentioned name, convey the premises so conveyed to her by the said Bridget Wickham to one A. Ruggles Holbert, by deed dated November 26, 1849, and the said A. Ruggles Holbert duly conveyed the same, by deed of conveyance under his hand and seal, to the plaintiff, which deed was dated December 27, 1892."

The evidence is, not that Mary Ann Durland conveyed "the premises so conveyed to her by the said Bridget Wickham to one A. Ruggles Holbert, by deed dated November 26, 1849," but that Mary A. Durland gave a quitclaim deed to A. Ruggles Holbert, dated June 1, 1881, for a consideration of one dollar, conveying the same property which had been deeded to her by Bridget Wickham. She had 18 years previously conveyed a part of this same property to the grantors of Thomas E. Durland, who was at that time in the actual possession of the portion of the premises conveyed as a part of his farm. While the title to that portion of the land under water lying outside of the lines of the survey may have been conveyed to A. Ruggles Holbert, it is impossible that he should have acquired any rights to that portion of the pond in the actual possession of Thomas E. Durland and Mary Ann Durland, who, as a witness in behalf of the plaintiffs, distinctly testifies that she did not understand that this quitclaim deed related to any of the property which she had conveyed to her daughters, that they might give a good title to Thomas E. Durland. Obviously, Mary Ann Durland could convey by quitclaim deed no greater

estate or interest than she herself possessed (2 Rev. St. [9th Ed., Banks & Bros.] p. 1813, § 143), while the grant of lands in the actual possession of a person claiming under a title adverse to that of the grantor would be entirely void (Id. § 147). The defendant, whose title descends from Thomas E. Durland, being the owner in fee of the lands under water in that portion of Wickham's pond where the trespass is alleged to have occurred, and where the defendant has for a long series of years cut ice for storage, the plaintiffs have failed to establish their right to the injunction granted by the trial court.

We have not thought it necessary to go into the discussion of adverse possession, because it clearly appears that the defendant has a complete title to so much of the pond as is necessary for his own convenience,—as good a title as the plaintiffs would have if the findings of the trial court were warranted by the evidence,—and it is not necessary to extend the inquiry further.

The judgment should be reversed.

Judgment reversed, and new trial granted; costs to abide the final award of costs. All concur.