The J. Thompson Manufacturing Company, Appellant, vs. Gunderson, Respondent.

*March 22 — April 6, 1900.*

*Contracts: Manufacture of machines according to model: Acceptance: Waiver of defects: Implied warranties: Worthlessness: Burden of proof: Measure of damages.*

1. If machines manufactured under a contract according to a model furnished by the vendee are sent out to dealers in a defective condition with the knowledge and consent of the vendee, he cannot hold the manufacturer responsible in damages for their failure to work; and if the vendee takes them and, with full opportunity for examination and knowledge of the variance between the machines contracted for and the ones furnished, fails to give the manufacturer timely notice that he does not accept them as being in compliance with the contract, the defects will be deemed waived.

2. Under a contract providing for the manufacture of a certain number of tobacco transplanting machines according to a model, except that the shoes were to be of steel instead of cast iron, and containing a stipulation that the manufacturer did not guarantee them to work and that the vendee assumed the risk, no implied warranty arose that the steel to be used for the shoes and gatherers should "scour in the soils of this country." The law merely implied an obligation that the manufacturer should use reasonable care in the selection of materials, and that, so far as its efforts entered into the manufacture of the materials, there should be no·

latent defect in either materials or workmanship. Remarks in *J. I. Case P. Works v. Niles & Scott Co.* 90 Wis. 590, limited.

3. If the vendee retained the machines without any offer to return them he assumed the burden of showing that they were worthless; and the manufacturer could recover their actual value, notwithstanding they were totally unfit for the use for which they were made, less such special damages as the vendee had properly pleaded and proved.

APPEAL from a judgment of the circuit court for Rock county: JOHN R. BENNETT, Circuit Judge. *Reversed.*

This action is brought to recover on a written contract for the manufacturing of fifty tobacco transplanting machines in the year 1892, at $40 each, and on a verbal contract for remodeling the same machines in 1893, at $5 each. Credit was allowed for $891.12, and judgment was demanded for $1,358.88 and interest. The issue tendered was that only thirty-nine of the fifty machines were made, and they were not made according to the contract, by reason whereof they would not work properly and defendant lost the sale of the same. By way of counterclaim, defendant set up that a part of said machine known as "gatherers" was not made according to the model of hard plow steel, would not scour, and the machine would not work properly, whereby said machines were a total loss to the defendant.

On the trial, evidence was offered that the steel shoes of the machines were not made of the proper kind of steel and would not scour, and the defendant was permitted to amend his answer at the close of the testimony to cover this alleged defect. The court submitted the question of the defects mentioned to the jury, with instructions that if they found such defects existed they might find a verdict for defendant for the amount he had paid to plaintiff, together with the profits defendant might have made on the fifty machines. The jury brought in a verdict for defendant for $889, from which the court required the defendant to remit $20 as a condition of denying a motion for a new trial on the ground

of newly discovered evidence. Judgment was entered for defendant, from which the plaintiff has taken this appeal.

*J. B. Dow, William Smith,* and *A. A. Jackson,* for the appellant.

*E. D. McGowan,* for the respondent.

BARDEEN, J. The facts in this case are involved in a great deal of doubt and uncertainty. Indeed, the confusion is so great that the labors of the court have been greatly increased in endeavoring to arrive at the ultimate rights of the parties. The contract regarding which the main controversy has arisen is as follows:

"Beloit, Wis., May 18th, 1892.

"*G. S. Gunderson, Beloit, Wis.:* We will make and furnish and complete fifty tobacco transp. machines, built like your model planter, except we will furnish steel shoes instead of cast-iron, for the sum of forty dollars ($40.00) each. We are not to guaranty working of machines. You assume all risk, and will sell, set up, and start all machines, and get settlement for same. You to pay us six hundred dollars ($600.00) cash now, and the balance to be settled by cash or good notes within ninety days. Respectfully,

"J. THOMPSON & SONS MFG. CO.

"Accepted. G. S. GUNDERSON."

Under this contract the plaintiff claims to have manufactured fifty machines, thirty-nine of which were delivered, and the remainder were held in the shop subject to defendant's order. It appears that the defendant was the inventor of the machine. It had been tested to a limited extent during the years prior to 1892 by a crude model made under defendant's directions. In the early part of 1892 defendant caused a complete model to be made, which was the one taken to plaintiff's shops, and was the one referred to in the contract. This model had a cast-iron instead of a steel shoe. Whether the gatherers, concerning which a great deal of

controversy has arisen, were attached to the model, or were simply delivered at the shops, is a matter of very much doubt. It is practically agreed, however, that the machines sent out in 1892 had no gatherers upon them, and that the defendant set up and attempted to operate his machines without them. These gatherers were made of a narrow strip of steel, polished on one side, and designed to run in the ground and press the earth up to the plant after it had been set. In order for them to do good work it was necessary that they scour. Their cost was about fifty cents for each machine.

It will be observed that the contract calls for a steel instead of a cast-iron shoe. The evidence shows that a large number of these machines (just how many no one can tell from the evidence) were sent out with cast-iron shoes,— whether with defendant's consent and approval, or not, the evidence is equally uncertain. These facts, however, do appear: Prior to the date of the contract, plaintiff had manufactured a number of these machines,— just how many, no one appears to know. On May 14th one of the machines was sent to Spaulding, at Broadhead, and another to Wagley, at Orfordsville. On May 21st another was shipped to Perrigo, and on the 25th one to Foltz, at Clinton Junction,— each with a cast-iron shoe and without gatherers. On June 10th twenty more were sent to Spaulding. The defendant saw this consignment and knew that they had no gatherers and had the cast shoe. It is reasonably certain that the first four machines sent out had been made before the contract was drawn. It is equally certain that they were considered and treated as machines made under the contract. No one seems to be able to explain why the machines sent to Spaulding on June 10th had the cast-iron instead of the steel shoe, or why gatherers were not sent. The defendant knew of these facts before they were sent, and went out and set up and attempted to operate the machines,

without the least objection.   The machines worked unsatis-
factorily    At defendant's request, steel shoes were sent out,
but for how many machines the evidence fails to give any
light.   The steel shoes failed to work because they would
not scour.   Only one of the machines sent out worked sat-
isfactorily, and this was paid for.   At some time before the
opening of the season of 1893 the defendant bargained with
plaintiff to remodel these machines according to his direc-
tions, for which he agreed to pay $5 each.   Changes were
made, but in how many no one seems to know.   The ma-
chine was again  tested in 1893, and failed to work because
the shoes and gatherers would not scour.

   The defendant claims that, if the machines had been
made according to the contract, he could have sold the en-
tire lot the first season and realized a handsome profit on
each one.   The case was submitted to the jury on that basis,
with the added qualification, stated in the charge of the
court, that the law implied a further condition to the con-
tract,— that the steel to be used in shoes and gatherers
should be of such quality as would scour in the soils of this
country, and if they did not meet this requirement it was
not a compliance with the contract.

   We do not think the case was fairly submitted to the
jury.   In the first place, if the machines sent out the first
year with the cast-iron shoes and without gatherers were
sent with the knowledge and consent of defendant, he can-
not hold the plaintiff responsible in damages for their fail-
ure to work.   Or if, with full opportunity for examination
and knowledge on his part of the variance between the ma-
chines contracted for and the ones furnished, he took them
and failed to give the plaintiff timely notice that he did not
accept them as being in compliance with the contract, the
defects will be deemed waived.   Such is the law of this
state.   *Locke v. Williamson*, 40 Wis. 377; *Morehouse v. Com-
stock*, 42 Wis. 626; *McClure v. Jefferson*, 85 Wis. 208.   The

fact that the machines were to be made like the model furnished does not alter the rule, so long as the defects complained of are obvious and conspicuous, as they were in this case. There was evidence in the case from which the jury might have inferred that the cast-iron shoes were put on by defendant's consent, and that he likewise acquiesced in sending out the machines without the gatherers. The evidence as to notice given defendant is vague and indefinite, and somewhat in dispute. Under the charge of the court, no such fact was presented to the jury; and, being fairly in the case, it was error not to so submit it. The jury might well have found a waiver of the exact conditions of the contract, under the circumstances in proof.

An important question arises as to the true construction to be given to the contract in suit. The defendant seeks to apply the rule that when a manufacturer contracts to supply an article which he produces, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment and skill of the manufacturer, there is an implied warranty that it shall be reasonably fit for the purpose for which it is to be applied. This is the rule adopted by the court when he instructed the jury that the law implied an obligation on the part of plaintiff to use a quality of steel that would scour in the soils of this country. No such engagement appears on the face of the contract. The contract is to make a given number of machines according to the model, except that the shoes were to be steel instead of cast-iron. It is nothing more nor less than an executory contract to manufacture goods. The obligation imposed by the law, as stated by some of the authorities, is that the machines shall be free from any latent defect growing out of the process of manufacture. *Durbrow & H. Mfg. Co. v. Cuming,* 35 App. Div. 376; *Cosgrove v. Bennett,* 32 Minn. 371; *Goulds v. Brophy,* 42 Minn. 109: *Carleton v Lombard, A. & Co.* 149 N. Y. 137; *Hoe v. Sanborn,* 21 N. Y 552.

*Durbrow & H. Mfg. Co. v. Cuming* was a case where the plaintiff contracted to make 100 machines for sewing in sweat bands, in accordance with a model. The defense was that the machines did not work properly. The court say: "The rule is well established that, in cases of executory contracts for the manufacture and sale of goods of a particular description, there is an implied warranty that they are free from any latent defect growing out of the process of manufacture, and that this is the sole warranty that attaches to such a contract. But when there are defects in the goods which could be discovered upon inspection, and the vendee neither returns nor offers to return the property, nor gives to the vendor notice or opportunity to take it back, in absence of a collateral warranty or agreement as to quality, he is conclusively presumed to have acquiesced, and may not therefore complain of inferior quality,"— citing *Studer v. Bleistein*, 115 N. Y. 316; *Coplay I. Co. v. Pope*, 108 N. Y. 232.

We obtain the following from *Cosgrove v. Bennett, supra:* "The defendant insists that a warranty is, under the circumstances, to be implied, that the mill ordered should be reasonably fit for the business for which it was intended. To this we do not agree. . . . The general rule is stated to be that, when an article is ordered to be manufactured for a particular use or purpose, there is an implied warranty that it is to be reasonably fit for such use or purpose. But when, as in this case, the article ordered was to be of a particular design or pattern, well defined and understood between the parties, and the article made and delivered in pursuance of the contract conforms to the pattern or model, there is no warranty implied, further than it should be of good workmanship and material."

Along the same line is the case of *Gachet v. Warren*, 72 Ala. 288, in which Chief Justice Brickell used the following language: "But if a manufacturer or dealer contracts to sell a known and described thing, although he may know

the purchaser intends it for a specific use, if he delivers the thing sold there is no implied warranty that it will answer or is suitable for the specific use to which the purchaser intends applying it." Another case very frequently cited is *Whitmore v. South Boston I. Co.* 2 Allen, 52, and which fully sustains the general doctrine. In *Mason v. Chappell,* 15 Grat. 572, it is said that where a specific article is ordered and furnished, although the purchaser states the purpose to which he intends to apply it, there is no implied warranty on the part of the vendor that it is suitable for that purpose; and he will not, in absence of fraud or an express warranty, be held liable, however unfit and defective it may turn out to be.

In further support of this same rule is *Wis. R. P. B. Co. v. Hood,* 54 Minn. 543, which says: "If an order be given for a specific article, of a recognized kind or description, and the article is supplied, there is no warranty that it will answer the purpose described or supposed, although intended and expected to do so." The ground upon which the seller or manufacturer is held liable on the warranty is whether the *purpose,* and not the specified article, is the essential matter of the contract. A copious note covering the question of implied warranty on sales of personal property may be found appended to the case of *McQuaid v. Ross* (85 Wis. 492) in 22 L. R. A. 187.

A case bearing a close parallel to the one at bar is *Schoenberger v. McEwen,* 15 Ill. App. 496; the holding being that where one orders an article of a manufacturer, and designates a particular kind of material out of which the article is to be made in whole or in part, such material not being made by the manufacturer himself, if he uses the designated material the law does not imply a warranty as to its quality or fitness, unless it be shown that the manufacturer failed to use reasonable and ordinary care in selecting it. In *Cunningham v. Hall,* 4 Allen, 268, the contract was for the con-

struction of a vessel, in which it was agreed that it should be covered with pine plank; the builder to see "that she is just right in all respects." It was held that the latter agreement was qualified by the former, and that the purchaser assumed the risk of defects which were naturally incident to pine plank and not known to the builder and could not have been discovered by him by the exercise of reasonable care and skill. And in such case there is no implied warranty which will cover the defect.

Reference has been made to the authorities in other states to show how deeply the rules thus stated are intrenched in the jurisprudence of this country. Following this line of authorities, this court held in *Milwaukee B. Co. v. Duncan*, 87 Wis. 120, that when a known, described, and defined article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still, if the thing described be actually supplied, there is no warranty that it should answer the particular purpose intended by the buyer; and if the article is sold by a formal written contract, which is silent on the subject of warranty, no warranty can be ingrafted or added to the written contract. There is some language in the opinion in *J. I. Case P. Works v. Niles & Scott Co.* 90 Wis. 590, which is supposed to encroach upon this rule. In that case the evidence tended to show that the wheels in controversy ought to have been made of refined iron. There was a stipulation against the use of defective material, and the court said, in effect, that this stipulation meant that material not suited for the purpose should not be used, and that it was no compliance with the contract to use a kind of iron unfit to be used in the manufacture of such wheels. Stress was laid upon the stipulation against the use of defective material, and it was said that this was "substantially an agreement that material not suitable to the purpose should not be used, and required that the iron for the spokes should be of the necessary grade and

quality, if there was any such procurable in the market." If this is to be construed to mean that refined iron should have been used, and that such was the implied agreement, the case goes beyond any to be found in the books. If, however, the meaning intended was that the manufacturer was bound to use reasonable care in the selection of material for the wheels, and that he ought not to have used a kind of iron notoriously unfit for the purpose intended, it can easily be reconciled with the cases cited. Any broader construction than the one last suggested ought not to be sustained. This result is reached by a construction of the contract itself, and not by the interpolation of implied covenants.

Applying the principles of law hereinbefore stated to the case before us, we are satisfied that no implied warranty arose, from the contract in suit, that the steel to be used for the manufacture of the shoes and gatherers should " scour in the soils of this country." The law implied an obligation that plaintiff should use reasonable care in the selection of the materials, and that, in so far as the plaintiff's efforts entered into the manufacture of the materials, there should be no latent defects in either materials or workmanship. The proof is undisputed that plaintiff used open-hearth steel for the shoes and gatherers,— a kind of steel in common use, and a kind the plaintiff had used for many years in the manufacture of a corn planter which it had been selling, and which had worked successfully. The instruction given the jury by the court furnished no proper test of the plaintiff's liability.

The court further instructed the jury that, if they found for the defendant, he might recover the profits he would have made on the entire lot of machines. This was error, because one of the machines, at least, had been accepted and paid for.

The court also proceeded upon the assumption that the machines were entirely worthless. The defendant testified that they were perfect in every respect, except as to the shoes

and gatherers. The evidence does not show what it would have cost to have obtained new shoes or gatherers, but it is perfectly evident therefrom that the cost would not have exceeded $5 or $6 for each machine. These portions could easily have been duplicated, and the entire machine could have been utilized. Moreover, none of the machines was returned to plaintiff. The evidence fails to disclose any basis upon which we can compute their value, but they were certainly worth *something*. The rule is that if the vendee retains the property, without any offer to return, he takes upon himself the burden of showing that the property purchased is entirely worthless, not only for the purpose for which it was purchased, but for every purpose. In such case the vendor may recover the real value of the chattel, if any, notwithstanding its total unfitness for the use for which it was purchased. *Warder v. Fisher*, 48 Wis. 338. In such case the measure of damages would be the difference between the contract price and the actual value, and, if the case should show special damages, the vendee would also be entitled to recoup or recover such as he had properly alleged and proven.

Upon any proper theory of the case, the rule of recovery given by the court was erroneous.

Many other questions have been raised and discussed, but sufficient has been said to cover the main issues in the case and furnish a proper guide upon another trial.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.