CHEBOYGAN PAPER CO. *v.* EICHBERG.

1. SALES—WARRANTY—BREACH—CONDITION PRECEDENT—QUALITY.
    Where defendant contracted to buy paper from plaintiff,
    the material to be of standard quality in the trade, and
    acceptable to the defendant, permitting a variation of
    three per cent. in tensile strength, as a precedent con-
    dition the paper must conform to the specified quality
    and weight or the purchaser need not accept and pay for
    it.

2. SAME.
    In the sale of goods by description there is a warranty
    that they shall answer the description, if given by way
    of indicating the character or quality of the article sold,
    and not merely for purposes of identification; it is not
    an implied warranty, but is construed as constituting an
    express undertaking that the article shall be as it is
    described. It does not survive an acceptance after in-
    spection.[1]

3. SAME—DEFECTS.
    When the buyer of paper discovered its failure to conform
    to the specifications in the contract, and, instead of re-
    jecting the material, used it, notwithstanding its claimed
    defects, its acts amounted to an acceptance and defendant
    could not recoup for breach of the vendor's duty to fur-
    nish paper in conformity to contract specifications.[2]

Error to Calhoun; North, J. Submitted October
8, 1914. (Docket No. 33.) Decided January 4, 1915.

Assumpsit by the Cheboygan Paper Company
against Morris Eichberg and another for goods sold
and delivered. Judgment for plaintiff. Defendants
bring error. Affirmed.

[1] As to the distinction between warranty of identity and war-
ranty of quality, see note in 35 L. R. A. (N. S.) 265.

[2] For waiver by use of right to rescind contract of sale for
breach of warranty or noncompliance with contract, see note
in 36 L. R. A. (N. S.) 468.

*Arthur & Beck* and *Burritt Hamilton,* for appellants.

*Victor D. Sprague* and *C. S. Reilley,* for appellee.

MOORE, J.   The plaintiff is a Michigan corporation engaged in the manufacture of paper.   Defendants are a copartnership engaged in the manufacture of bags at Baltimore, Md.   This suit is brought for a balance claimed to be due it for the manufacture and delivery of paper made under the provisions of two contracts, one dated October 17, 1908, one dated July 6, 1909, and a supplemental contract of July 6, 1909.

There was delivered under these contracts paper of the approximate value of $120,000.   Trouble arose between the parties and this litigation followed.   Defendants pleaded the general issue, and gave notice of set-off and recoupment.   The only item of these defenses involved in this review is a claim of damages for breach of warranty amounting to $5,991.64, which defendants sought to recoup.   From a verdict and judgment in favor of the plaintiff, the case is brought here by writ of error.

The appellants discuss their assignments of error under two heads, the first of which is that there was a mutual release of liability.   This claim is based upon the following language contained in the contract of July 6, 1909:

"And it is further understood and agreed, by and between the parties hereto, that the contract under date of October seventeenth, nineteen hundred and eight, existing between the parties hereto, shall be henceforth and forever considered canceled and annulled, to all intents and purposes, as if the same had never been entered into, the parties hereto releasing and discharging each other from all liability growing out of or arising therefrom."

The first contract had this language in it:

"It is further agreed that party of the first part

shall carry 100 tons of bag paper of the above-mentioned grades in the warehouse of party of the second part, and shall keep same insured, but will be at no further expense in regard to such stock. Specifications for the 100 tons to be furnished party of the first part by party of the second part thirty days before this contract is to take effect."

When the second contract was made there was in storage in Baltimore 350 tons of paper, placed there for defendants. The supplemental contract was made the same day the second contract was made. It reads:

"July 6, 1909.

"It is hereby agreed between the Cheboygan Paper Company, of the first part, and the Paper Mills Company, of the second part, that the paper now in store in Baltimore, amounting to 350 tons more or less, shall be reported by them weekly as provided under contract dated October 17, 1908, so that the total amount of paper now in storage there shall have been reported used within ninety days from the date hereof. If at the end of ninety days there should remain any portion of the said 350 tons not reported by the Paper Mills Company, such portion shall be settled for by note from the Paper Mills Company to the Cheboygan Paper Company, which note, or any part thereof, shall be extended from time to time at the option of the Paper Mills Company, and shall be exclusive of the settlement by note of an amount equal to 100 tons which has been provided for in contract of this date

"CHEBOYGAN PAPER CO.,
"By H. A. FRAMBACH, President.
"PAPER MILLS CO.,
"M. H. EICHBERG."

In view of the language contained in the supplemental contract, and the conduct of the parties following the making of the contracts of July 6, 1909, we think there is no merit in the claim of a mutual release.

The second group of assigned errors grows out of the failure of the court to allow defendants to recover

for a breach of an express warranty, in that the paper was overweight.  We cannot present this claim better than to quote from the brief:

"The second contract contained the following express warranty:  'And the said party hereto of the first part, vendor, further agrees that all. the paper delivered under the terms and provisions of this contract shall be of the standard quality, which is considered by the customs of the trade as a good delivery, and acceptable in all respects to the said parties hereto of the second part, vendees, with the allowance of a variation of 3 per cent. in the tensile strength as shown by a Mullen tester, or in weight over the designated or ordered basis weight.'  That the foregoing clause falls squarely within the definition of an express warranty is fully supported by the authorities:  'A warranty in a sale of personal property is a statement or representation made by the seller, contemporaneously with and as a part of the contract of sale, though collateral to the express object of it, having reference to the character of, or the title to, the goods or article sold, and by which the seller promises or undertakes that certain facts are, or shall be, as he represents them.  The warranty is express when created by apt and explicit statements of the seller.'  30 Am. & Eng. Enc. Law, p. 129.

"Language strikingly similar to that employed in the second contract, and under parallel circumstances, was held to constitute a warranty in the case of *American Glue Co.* v. *Rayburn,* 150 Mich. 616 [114 N. W. 395].  The objection to overweight paper in the manufacture of bags is that it will produce fewer bags per pound than paper of lighter weight."

It is claimed the last-named case rules the instant case.

As to the alleged breach of an express warranty, counsel for appellee say:

"*First.*  There was no express warranty in either of the contracts sued on in this case; the provision in the second contract as to the qualities was not a warranty, but a description—a condition; that it con-

184 Mich.—3.

stituted a sale by description, which placed upon the buyers the duty to inspect, and accept or reject, the paper tendered thereunder.

"*Second.* That by the very terms of the second contract the purchasers, defendants, were obligated to seasonably accept or reject paper tendered by plaintiff thereunder; it being provided therein that the paper 'shall be    *    *    *    acceptable in all respects to the said parties hereto of the second part, vendees.'

"*Third.* That on February 23, 1910, in writing, defendants acknowledged they had no existing claim for alleged overweights of paper, and completed an agreement, in writing, signed by both parties to the so-called 'second contract,' that defendants should thereafter lay aside all paper received by them from plaintiff that was not up to standard in weight, quality, and finish, and that all paper thereafter shipped defendants was shipped under said agreement completed February 23, 1910, and that by its terms defendants were required to accept or reject all paper seasonably on its receipt, and therein and thereby any express warranty in the second contract, if any ever existed, was abrogated.

"*Fourth.* That, under the admissions of the defendants made in open court, defendants neither offered, nor can offer, any competent proof of damages in any event, so that the ruling complained of, being based upon this incompetent testimony, was not erroneous, and moreover, if erroneous, which we strongly deny, is harmless."

The record shows there were occasional complaints made that the paper was running overweight, and was not making the requisite number of bags. The plaintiff claimed the weight was, as a rule, all right, and suggested that the paper was cut larger than necessary for the bags. The interpretation of the contracts made by the parties thereto is indicated by extracts from the correspondence as follows:

Mr. H. A. Frambach, president of plaintiff company, went to Baltimore, and while there dictated a letter to his son in which appeared the following:

"Oct. 22d, 1909.
"Mr. J. H. Frambach, Cheboygan Paper Co.,
"Cheboygan, Mich.
"*Dear Harry:*

"I herewith inclose note and letter just dictated in my presence by Mr. Hirsch. Please hand this to Mr. Jolly.

"I have also gone over some weights and will bring with me cards of the rolls and samples of the paper showing that some of it is running overweight, although the majority of the paper is running very accurate to weight. Now, Harry, see that no more of the paper runs overweight. While we have a margin of three per cent. that does not mean of course three per cent. over or three per cent. under, but it should average.

"I have handed Mr. Hirsch your last estimate of car loads shipped, which he will check up as soon as it arrives, and I hope that we have our weights down so that they will average up all right. Mr. Hirsch has notified me that if the paper runs over in future that he will charge back the overweight."

"Feb. 21, '10.
"Mr. M. L. Hirsch, Paper Mills Co.,
"Baltimore, Md.
"*Dear Sir:*

"I have your esteemed favor of the 17th inst., which I find upon my desk this morning. Since I returned from New York I have been quite ill with a cold and have been in the house considerable of the time. * * * Then there has been considerable fault found with our weights. Our records reveal exactly to us the condition of the weights and if you were here and saw our system you would quite agree with us that we know what we are talking about. While there was some of the paper that ran a trifle heavy, but nothing serious, there was considerable of the paper that ran a little under the specified weight which would even up the car load shipment, and give no cause for complaint. However, this was not so serious as you have never made any specific claim against us, but have intimated lately that you would do so. Whenever our paper is not right, the only way to do is to lay it aside and have it returned. Then

we will investigate at this end of the line as to whether you were justified in doing so or not." * * *
"Very truly yours,
"H. A. Frambach."

"Baltimore, Md., Feb. 23d, '10.
"Col. H. A. Frambach,
"Cheboygan, Mich.
"*Dear Colonel:*
" * * * Regarding basis weights, writer showed you while you were here that the basis weights were over, and while we have never made any deductions on account of this error in basis weight, we feel we would have been fully justified and would have done so except for the strong friendship which exists between yourself and the writer.

"We shall follow your instructions hereafter as to laying such paper aside that is not up to the standard in weight, quality and finish, although we think you will change your position the first time this condition comes up. We have always tried to use your paper at a loss to ourselves, yet you are fully aware that the paper has not been up to the basis weight as ordered and consequently entailed a loss on us which we have always suffered. * * *
"Yours very truly,
"M. L. Hirsch."

On March 14, 1910, a letter was written in which it was said:

"In the meantime, we want to call your attention to the fact that we cannot use the five or six cars which we have in the house and must be given immediate disposition of same, as we have no room to store it, unless there is a disposition on your part to allow us the privilege of using it and charge you back with such loss as we sustain. This is fair and we should think would be reasonable with you and be of little loss to each of us."

Later the following telegram was sent:

"Baltimore, Md., March 16, 1910.
"Cheboygan Paper Co.,
"Cheboygan, Mich.
"Reject shipment March first entire car wet torn

not up to quality or weight.   Suggest Colonel Frambach coming to Baltimore immediately.

"PAPER MILLS CO."

Col. Frambach was unable to go to Baltimore, and his son went on, and a settlement was reached upon the basis of allowing defendants $1,101.60, to be paid in paper.   This is the only time any paper was rejected.   There was much other correspondence which we have not quoted.   Taken in its entirety it shows that, while there were occasional complaints by defendants, and statements made by plaintiff of a desire to fulfill the terms of the contract, and a willingness to have defendants reject any paper which did not meet their requirements, at no time was there a suggestion that defendants might accept and use the paper and then present a claim for damages upon the theory that the contract contained a warranty.

It must be remembered that at the time the second contract was made the paper was not in existence, but was to be manufactured and so it was provided in the contract:

"That all paper delivered under the terms and provisions of this contract shall be of the standard quality, which is considered by the customs of the trade as a good delivery, and acceptable in all respects to the said parties hereto of the second part, vendees, with the allowance of a variation of 3 per cent. in the tensile strength as shown by the Mullen tester or in weight over the designated or ordered basis weight."

By the terms of the provision quoted it was a condition precedent that the paper tendered thereunder should be of standard quality, and should not vary more than 3 per cent. in tensile strength and weight over the ordered basis, and should be acceptable to the purchasers.   Paper that was not of standard quality and that varied more than 3 per cent. in tensile strength or weight over the ordered basis did not comply with the terms of the contract of sale, and

imposed no obligation on the vendees to receive and pay therefor.

A consideration of the language in the contract in connection with an examination of the case of *American Glue Co.* v. *Rayburn,* 150 Mich. 616 (114 N. W. 395), cited by counsel for appellants, will show that the case is easily distinguishable from the instant case.

It must be conceded that there is a lack of uniformity in the authorities. The rule has been stated as follows:

"When the subject-matter of a sale is not in existence, or not ascertained at the time of the contract, an undertaking that it shall, when existing or ascertained, possess certain qualities is not a mere warranty, but a condition the performance of which is precedent to any obligation upon the vendee under the contract, because the existence of those qualities, being part of the description of the things sold, becomes essential to its identity, and the vendee cannot be obliged to receive and pay for a thing different from that for which he contracted." *Pope* v. *Allis,* 115 U. S. 363, 371 (6 Sup. Ct. 69) ; 2 Mechem on Sales, §§ 1208-1212.

Again:

"In the sale of goods by description, there is a warranty that they shall answer the description, where it is given by way of indicating the character or quality of the article sold, and not for the purpose of identifying it merely, and when the buyer relies upon it as a warranty. It is not an implied warranty, but is construed, under such circumstances, as constituting an express undertaking that the article shall be as described. Such a warranty will not survive an acceptance after inspection." 30 Am. & Eng. Enc. Law, p. 154, and cases cited.

The record shows that, after knowledge of conditions in the paper which defendants claimed amounted to defects, they accepted the paper and used it.

The principles of law involved have recently been

the subject of discussion in this court in the cases of *Columbus & Hocking Coal & Iron Co.* v. *See,* 169 Mich. 661 (135 N. W. 920) ; *Gill & Co.* v. *Gaslight Co.,* 172 Mich. 295 (137 N. W. 690). It is not necessary to restate what is said in the opinions in those cases. We think they are controlling of the instant case.

Judgment is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OS-TRANDER, BIRD, and STEERE, JJ., concurred.