PENNSYLVANIA RUBBER CO. *v.* DETROIT SHIPBUILDING
CO.

1. SALES—ACCEPTANCE—BREACH OF CONTRACT—WARRANTIES.
   Failure or omission to reject tiling furnished for two boats, and laid by the vendor under the supervision of defendant's architect, was equivalent to an acceptance of the materials and workmanship if the defects were obvious.

2. SAME—WAIVER—QUALITY.
   Where defendant contractor purchased rubber tiling to be used in the construction of certain boats, subject to approval by the architect, he might waive the provisions of the contract calling for such approval.

3. SAME—CONTRACTS—WAIVER—ACCEPTANCE.
   Evidence tending to show that tiling used in the construction of two boats was purchased by defendant under a contract providing for approval of its architect, that complaints were made by defendant's agents during the progress of the work, that plaintiff refused to furnish better work or materials and offered to remove the material

186 Mich.—20.

terials if unsatisfactory, that no actual rejection of the materials took place before the boats were turned over to the owner for use, *held*, to present an issue of fact for the jury whether an acceptance was shown.[1]

4. SAME—ACCEPTANCE—WAIVER—PAYMENT.

There was no warranty that would survive approval and acceptance under a contract providing for payment within thirty days after completion and acceptance.

5. SAME—CONTRACT—WARRANTY.

A contract requiring that rubber tiling to be furnished should be water tight did not require compliance, but the material should be laid so as to prevent water from leaking through in sufficient quantity to cause damage to materials and substances underneath.

Error to Wayne; Shepard, J., presiding. Submitted April 8, 1915. (Docket No. 28.) Decided June 7, 1915.

Assumpsit by the Pennsylvania Rubber Company against the Detroit Shipbuilding Company for a balance due for work, labor and materials. Judgment for plaintiff. Defendant brings error. Affirmed.

*Angell, Bodman & Turner,* for appellant.

*Anderson, Wilcox & Lacy* and *Walters & Hicks,* for appellee.

STONE, J. This litigation grows out of the fact that in the fall of 1909 the parties made two contracts for the furnishing and installation by the plaintiff of so-called rubber tiling upon two steamers then under construction by the defendant. Except that one contract was for steamer known as No. 180, afterwards named the Rochester, and the other for steamer known as No. 181, afterwards named the Octorara, they were identical. The dispute involves substan-

[1] As to waiver by use of right to rescind for breach of warranty or noncompliance with contract, see note in 36 L. R. A. (N. S.) 468.

tially the same questions as to both steamers. A suit was brought by plaintiff upon each contract, for failure to pay the agreed price. The pleas and notices were substantially the same in each case. At the trial the cases were consolidated. The declarations count upon the contracts, and allege performance and non-payment of the contract price. The pleas are the general issue with notice of recoupment. The jury under the charge found a verdict for the full amount claimed by plaintiff, judgment was entered accordingly, and the defendant has brought error.

The assignments of error are based on the refusal to give defendant's requests to charge, and on some language of the court in the charge as given. In 1909 the defendant was building its steamer No 180 (the Rochester) for the Richelieu & Ontario Navigation Company, and its steamer No. 181 (the Octorara) for the Erie & Western Transportation Company. The Rochester was a passenger steamer which ran between Youngstown and Ogdensburg, N. Y. The Octorara was a freight and passenger steamer of the Anchor Line, running between Buffalo and Duluth. Prior to the making of the contracts in question, the defendant had contracted with the plaintiff for the rubber tiling laid on the steamer City of Cleveland, which had been satisfactory and had been paid for, and the relations of the parties had been friendly. In the instant cases the contracts were dated September 30, 1909, and consisted of written orders and acceptances. On steamer No. 180, the order was for furnishing—

"all interlocking rubber tiling required on steamer No. 180, laid and finished complete. Workmanship and material to be of the best quality. Designs to be selected by this company. * * * Price 75 cents per square foot laid. Terms 30 days net, after completion and approval by architect, and acceptance by this company."

Plaintiff did the work on the Rochester in February and March, 1910, and on the Octorara in April, 1910. Frank E. Kirby was the architect of the Octorara, and Louis Keil of the Rochester. Following the acceptance of the two contracts, the defendant submitted to the plaintiff color designs for the two boats. It is undisputed that at this time, in the rubber-tiling business, two types of tiling were manufactured, one with a space between each block, or unit, to allow for expansion and to prevent "buckling;" the other on straight lines and close fitting, with space left around the edges close to the wall for the expansion. The type manufactured by plaintiff was the open-jointed type, which had been previously laid on the City of Cleveland. Upon the trial, on behalf of the plaintiff there was testimony in detail as to the manufacture of the tiling at its factory at Jeannette, Pa., and that the rubber tiling shipped to the defendant was of the best quality, and exactly according to the terms of the contract. The manager of the tiling department of the plaintiff testified, among other things, as follows:

"The tiling as made by the Pennsylvania Rubber Company is made to fit loose at the time of manufacture. That allowance is made on account of the exceptional expansive condition of the material. I could explain that by saying it is something in the nature of linoleum; that unless sufficient allowance is made, the material will expand and buckle in the center—come up from the floor, or from the surface on which it is laid. One of the merits of the Pennsylvania tile, as we saw it at that time, was having this condition taken care of by allowing a space between the blocks of tile."

The plaintiff's branch manager at Detroit testified that plaintiff employed Wm. E. Brady & Co., of Detroit, to install the tile on the steamers; that witness saw and was in charge of the work as it progressed from day to day; that the men who did the work were

experienced men; that Mr. Jeffreys, the general superintendent of defendant, was on the boats off and on inspecting, and that he saw Mr. Keil on the boat once; that they did criticise in one or two instances —made the criticism of the tiling being a little too rough, or in one case where the tile was chipped off from the ends—that the workmen took that tiling up and replaced it with new pieces; that witness saw the rubber tiling on the two boats after it was fully completed; that the workmanship on the steamers, in so far as the rubber tiling was concerned, was of the best quality; that after the job was completed he called on Mr. Ketcham, the secretary of defendant, to get payment of the invoices, and he said it had not been satisfactory; the complaint was that the water seeped through, and it was not satisfactory to the owners of the boat; that subsequent to May 12th witness took up with defendant the question of the payment of the two invoices a number of times; they said the tiling was not right; they claimed it did not close up enough, the water seeped through; that after June 1st Mr. Lewis, the general manager of the plaintiff, came on and took up negotiations. Witness further testified:

"At no time during these negotiations did I make any modification, written or otherwise, of the two contracts in question. I did not make any agreement with the Detroit Shipbuilding Company that they could keep that rubber for an indefinite time, or for any limited time beyond June 1st, to see whether or not they wanted to accept it. Mr. Lewis was the person in whom rested the final authority in this transaction, so far as the Pennsylvania Rubber Company is concerned.

"I inspected the tiling on the Octorara at the Detroit shipbuilding docks in August, 1910. The tiling looked fine. I think I discovered later in the color there was two or three different shades of green. In August it looked all right; surface was even. It had not closed up as much as it might. It had begun to

close up. It should not have been all closed up at that time; traffic was necessary to close it up.

"Mr. Jeffreys and Mr. Ketcham, and the gentlemen I have referred to, began to find fault with the work soon after we commenced installing, I believe it was on the Octorara. * * * Mr. Jeffreys first complained that the tiling didn't close up. Mr. Farr complained a little about the color; those two classes of complaints were, from the very beginning, color and closing; Mr. Keil didn't complain of anything to me."

Wm. E. Brady testified that his business was tile contracting, and had been for 20 years; that he superintended the laying of the tiling; that when the job was going on he looked at the tiling to see if it was being laid properly; that he found it was being laid all right. He further testified:

"Mr. Gobel and I went up to the boat after it was all completed. My idea of the floor was that the rubber was laid all right. Of course they were open—all rubber floors are open when they are first laid. It was a good job of rubber floor work. Of course, there was some joints open. All rubber floors are open when they are first laid, until they tighten up. It is impossible to lay a rubber tiling floor so that the joints are all tight when it is first laid. I didn't see anything else the matter. I think this job—or these jobs upon these two boats—were, in workmanship and material, of the best quality."

One of the men who did the work testified that it was a good job.

Mr. Lewis, the general manager of the plaintiff, testified that he came to Detroit in June, 1910, after objection had been made by defendant, and after the boats had been turned over to the owners; that Mr. Ketcham said that they had decided, in order to. secure payment, it would be necessary for the plaintiff to give a bond of indemnity, and one had been prepared; this was objected to by the witness; that Mr. Farr, the president, and Mr. Ketcham said the joints were not close fitting, and they mentioned the water

seeping through; witness did not recall complaint about color or material, or cracked or broken pieces; witness told them that that was the way Pennsylvania tiling acted when it was laid. Nothing came of the interview. While in Detroit witness wrote defendant a letter, in which, among other things, he said:

"We are not prepared, under any circumstances, to give you better tiling, or more satisfactory work than we did on these two boats, and this tiling will prove satisfactory, the same as our tiling is proving satisfactory in dozens of other places; and we refer to tiling which is made in exactly the same way and of the same compound, as furnished you; and whenever Pennsylvania tiling proves defective, in material or workmanship, within a reasonable period of time, we stand ready to make it good, and our intentions in this respect we do not believe have ever before been questioned. If you desire to pass favorably on this tiling, we would appreciate an immediate settlement of the account under the terms of our contract. If you do not wish to accept it, we will immediately remove the tiling from the Octorara and the Rochester. This would mean a heavy expense to us, but we should prefer to do it, rather than to have the matter drag along indefinitely."

No reply was received to this letter. The witness testified further that plaintiff was not given an opportunity to work on the vessels in 1910 and 1911.

Mr. Farr was called by the plaintiff, under the statute, and testified that the Rochester was turned over to its owner in April, 1910, as completed, except the tiling; that about a month later she was taken away, and used during the season of 1910; that the Octorara was turned over to its owner in May, 1910, and was used during the navigation season of that year; that on the Octorara Frank E. Kirby was the man whose approval he expected to receive according to the contract covering the vessel, and Mr. Keil was the man on the Rochester; and that Mr. Kirby and

Mr. Keil had opportunity to inspect the tile before the steamers were turned over to the owners.

On behalf of defendant, Mr. Farr testified that he examined the work on the steamers, as it progressed; that the tile did not fit, the joints were open; that the tongue of the tile was in many instances broken, and the tile was discolored; some of the tiles were different color from others; that after the tile was laid, it was scoured and scrubbed by the employees; Gold Dust or other products were used; that this filled the joints with water; that he walked on the tile, and saw the water squeeze up through; that at the end of the job he could not see that the joints had expanded at all, and the colors were uneven. He testified:

"The edges of many of the tile were exposed, and many chipped and broken at the ends. The tile appeared hard. It was in that condition when we delivered the ships. I had several talks with Mr. Gobel. From a time before the Rochester was finished, until after the Octorara was finished—the work on the Octorara was done last—the condition of the tile on that steamer was much the same as on the other, both as regards joints and color. The defects and the attempted method of treatment were the same in both boats. Many defective tile were replaced. I had a conversation with Mr. Gobel as to the payment of the bill. * * * I replied that we would be very glad to pay the bill if they would finish the job, that is, carry out the Pennsylvania Rubber Co.'s contract; and he said that they had carried it out. We made out a check. I ordered a check made out, payable to, the order of the Pennsylvania Rubber Company for the full amount of the bill, with the idea of turning it over in case they would indemnify me in some way against loss. Also Mr. Gobel assured me that the tile would be all right after use; that their tile was different from what is known as the close-fitting tile; that after we had used it a season—or one or two seasons, I think he said—that it would close up and would be all satisfactory. Well, then, I replied that I thought it would be a good idea to give the tile a trial during that season, and if it turned out all right in the fall

and was acceptable, then we would turn over the money to him. And I would be very glad to if he would furnish a bond to indemnify us against loss, that is, I was willing to advance them money to help them out, and that led to the drafting of a form of bond, a redrafting of other forms, and nothing came of it. He said to leave the matter open until fall, and then decide on whether it was a good job or not. After this conversation the tile was tried out. The owner of the Octorara, when the boat was turned over, like the owner of the Rochester, refused to accept the tile. The owners of both boats were persuaded to allow the tile to remain down through the season to try it out."

After testifying at some length of the interview with Mr. Lewis, and referring to the proposed bond, the witness testified:

"He said the tile was there, and it was a good job, and he wanted his pay, and threatened at that time to take the tile out, and I reminded him that that would not do—that it would not be fair to the owners of the ships to take the tile out in the middle of the water season—and, furthermore, he could not take it out under the contract. He had no such privilege.  *  * * The architects at that time had not accepted the tile; nor had the owners." (Objected to as immaterial what the owners did. Overruled. Exception.)

The witness further testified that the season ended about the middle of September with the Rochester, and perhaps a little later with the Octorara; that after the close of navigation, on October 28, 1910, defendant notified the plaintiff, in writing, that the tile was not satisfactory. (This evidence was received over the objection of plaintiff that the contract, providing that work and quality be first-class, created a condition precedent, and defendant in turning boats over to owners, accepted the work; that the claimed defects were all known, and the tiling should have been refused if not satisfactory. Objection overruled. Exception.) He further testified that the tiling in

the smoking room of the Octorara was finally accepted by the owner, after it had been used for the season; that all the rest of the tiling on the Octorara, and all of the tiling on the Rochester, was taken up; that plaintiff did not replace any of this; that defendant arranged with the New York Belting & Packing Company to replace it and paid it for the work; that after such relaying the work was accepted by the owner of the boat; that before the tiling was removed from the Rochester, witness examined it in the spring of 1911, with Mr. Kirby, Mr. Keil, and the superintendent of the Richelieu Company; that the tile was in very bad condition; the joints were still open, and the tile was discolored; many were broken and discolored, and generally in a very bad condition; and there had been no expansion of the tile. Upon cross-examination, the witness testified that the defendant did not, after receiving Mr. Lewis' letter of June 29th, take any steps to remove the tiling.

Mr. Jeffreys testified that he saw the work of laying the tile while it was in progress; that he criticised it practically every day for open joints and bad color; that he did not say anything to Mr. Gobel, but made his complaints to the men laying the tile, and the office; that in witness' opinion the material was poor, and the workmanship was not good; that the real criticism was the open joints and defects in coloring, which were both apparent at the time; and that when the boats went into commission there was the same condition. A number of other witnesses swore to the same general conditions.

Mr. Keil, one of the architects, testified that he saw the tile installed on both ships, while they were installing it; that he told the men that were laying it that it would not pass; that it did not pass; that the trouble was the tile was uneven, and the joints were bad; that it was very brittle, and the color was

not the same, and there was a sufficiently marked unevenness in the tile to be unsatisfactory to witness as a designer; that he saw some of the pieces break while they were laying them; that the stuff looked raw and gritty; that he noticed the warping in different parts of the ship, and saw the faults in color; that the openings were wider than he was accustomed to see; that as architect of one boat, and associate architect of the other, witness did not accept and pass the tile on these vessels, and for the reasons stated; that he saw the Rochester in the spring of 1911, when she was lying at Prescott in the St. Lawrence river; that he examined her thoroughly, and found the tile in bad condition; that the joints were opened up considerably, and the colors had not changed any, and in some places whole tile were broken; that the tile was not at that time in such shape that he felt warranted in accepting it, and it was in worse shape than when the boat left Detroit in the spring of 1910. Upon cross-examination he testified that he examined the tiling every two or three days while it was being laid on the Rochester, and that he knew the tile was in the condition he had testified to while the work was going on, that he did not permit the boat to be turned over to the owners, and had nothing to do with that matter, and that he did not certify in general to the completion of the boat, but did say that the rubber tiling was not good.

Frank E. Kirby testified that he designed the Octorara, and was consulted by the defendant and the owners; that he observed the work of laying the rubber tiling on the boat, as it progressed; that the tile did not join well; that after the ship had run one season the joints were still bad, and considerable of the tile was broken; that in his opinion the workmanship and material of the job were not of the best quality; that the use of the tiling during the season

did not appear to affect favorably the openings in the joints; and that he inspected the tile on the Rochester in the spring of 1911, with Capt. Johnson and others, and that the condition was of the same general character as on the Octorara, as to the opening and the lack of expansion of joints. On cross-examination he testified that when the Octorara was turned over to the owners, he approved it conditionally. The following occurred:

"*Q.* What do you mean by 'qualified approval?'

"*A.* Anything that breaks down in the ship—while I pass her, I expect the company will make that good.

"*Q.* You approve or disapprove as to everything that is apparent?

"*A.* Yes, sir.

"*Q.* If there is a defect apparent, you either reject that, or else you approve it as defective?

"*A.* I reject it as bad.

"*Q.* You didn't reject any of the tiling on this?

"*A.* (interrupting) It didn't show any defect, only it was open. There was no breaking.

"*Q.* Then you approved it?

"*A.* No; I didn't approve it. I only qualified it.

"*Q.* Did you give any different approval on the rubber, than you did anything else?

"*A.* Oh, it is the same on everything else.

"*Q.* The same as everything else—that was a general approval, and you approved it?

"*A.* It looked all right.

"*Q.* It looked all right, and you approved it?

"*A.* Yes, sir."

Redirect examination:

"I said just now that when the boat went out, I hoped the tile would close up in the course of time. When I saw her after the season's use, the tile had not closed up. It did not work out as I hoped it would. Walking over the tile had apparently not caused it to expand at all."

Recross-examination:

"*Q.* You did not say that you would not approve

the tiling on the Octorara when it was turned over?

"*A.* No; we thought it would be satisfactory.

"*Q.* And you did not specifically disapprove it?

"*A.* No, sir."

Mr. Farr, being recalled, testified:

"Mr. Keil and Mr. Kirby gave a qualified approval on the boats in May, 1910, and final approval was given when the boats were accepted."

There was evidence tending to show that the tiling was of inferior quality, and an analysis of the same was testified to. It appeared that upon turning the boats over to the owners in the spring of 1910, payment for the same was made, and that nothing was withheld on account of the rubber tiling. The price paid to the New York Belting & Packing Company was 90 cents per square foot.

We have, at the expense of prolixity, set forth the substance of much of the evidence in order that it may clearly appear what the issue was, before the jury. Among defendant's requests to charge were the following:

"(3) The undisputed evidence shows that the Pennsylvania Rubber Company laid all the interlocking rubber tiling on the two steamers, but neither of the architects of the steamers approved it, nor did the Detroit Shipbuilding Company accept it; that the owner of the Rochester refused to accept any of it on that steamer, and that the owner of the Octorara refused to accept any of it on that steamer except so much as was laid in the smoking room.

"(4) Under the undisputed evidence, in view of the terms of the contracts between the parties, the plaintiff can, in any event, recover or be allowed only so much as represents the agreed price for the tile laid in the smoking room of the Octorara, viz., 473¾ square feet at 75 cents a square foot, or $313.31, with interest at 5 per cent. from June 12, 1910.

"(5) There is no dispute that the Detroit Shipbuilding Company replaced all the tile on the Rochester and all that on the Octorara, except that in the

smoking room not in controversy, with tiling furnished by the New York Belting & Packing Company, which was accepted by the owners of the steamers. It was the duty of the shipbuilding company to replace the tile, and it is entitled to be allowed the reasonable cost of replacing it. It is further entitled to be allowed such reasonable expense as you may find from the evidence it was reasonably obliged to incur in connection with the transaction, like freight, cartage, and storage of the old tile, which it offered to return to the Pennsylvania Company. It is entitled to be allowed the traveling expenses of Mr. Farr and Mr. Kirby and professional charge of Mr. Kirby for inspecting the Rochester in May, 1911, if you find from the evidence that the amounts expended thus were reasonable in amount, and were reasonably and properly incurred, in order to determine whether the claim of the owner of the Rochester was well founded, at the time, that the tile laid by the plaintiff on the Rochester was not in workmanship and material of the best quality.

"(6) If you find that the amount reasonably expended in removing the tile and relaying it to the satisfaction of the owners of the steamers, and in matters reasonably incidental thereto, exceeds, after allowing the plaintiff the contract price of the smoking room tile, the amount the shipbuilding company would have paid had the Pennsylvania Rubber Company fulfilled its contract, then the shipbuilding company is entitled to a verdict in its favor for this difference. In reaching a conclusion, interest should be allowed on each item from the time it was due or was expended."

In its charge to the jury the court said:

("The architect of the company, whose duty it was, under the contract made between the plaintiff and the defendant, to pass upon and accept or reject the job, accepted this job with all the rest of the work qualifiedly, that is, unless something should transpire afterwards that was then at that time unforeseen, that the ships would be accepted in the condition in which they were passed over, and among other things that were considered in the same light was the tiling, to-

gether with.all the other details going to make up the manufacture of the ships.)

"At this time the representations had been made, by those who were handling the tiling for the plaintiff company, that in time the tiling would expand, and that the color would come in proper manner and sufficient degree to please the parties for whom the tiling was being laid, and would be acceptable. It is the claim of the defendant company that this expansion did not take place, and that in the fall they notified the plaintiff company, and positively directed them to remove that tiling. The plaintiff company did not do so; and in the spring following the shipbuilding company, the defendant, claiming to do so at the request of the owners, removed the tiling, shipped it to Detroit and stored it here in this city, where it still remains.

"Now the claim of the plaintiff is that this was perfectly good tiling; that it was no more brittle than other tiling; that the color did not lack uniformity; and that the tiling did expand, and made as good a flooring as would comply with the contract made— that is, that it was of the best material and workmanship. (They did not contract that the tiling should be better than any other tiling. The contract was it should be equal to the best. It was to be good tiling, laid in good, workmanlike manner, and completed in such a manner as would answer the purposes for which it was laid.)

("It was not expected, perhaps, that it would be absolutely waterproof. Even water tanks that are supposed to hold water are not supposed to be absolutely waterproof and not leak a drop. Probably there is no tiling laid but what water will leak through somewhere.) But, substantially, I take it, it is expected to be laid in such a manner that it can be washed and cleaned, cleansed with water or liquid, without sufficient water going through to damage the deck below.

"The plaintiff further claims that this tiling did come up to this degree of quality, and was passed conditionally; that is, it was passed under the condition and accepted under the condition that it should comply with the terms of the contract. They claim that the parties complied with this condition, and that

it was virtually accepted by the defendant and should be paid for according to the contract.

"The defendant claims that it never did close up; that the seams, the several blocks, did not expand, and that the seams remained open to such an extent that water seeped through and onto the decks beneath and rusted the iron or steel plate where it was laid upon steel, and warped the boards that were laid upon the decking where there were boards just beneath the tiling; that it was unsanitary; that in the dining room there were particles of food, which were washed into the seams and remained in the seams and in time it became unsanitary, and that it was not properly laid or not properly manufactured and would not answer the purpose for which it was designed to be used.

"Now, so far as the color and the brittleness of the tiling is concerned, I do not think we are much interested in that. The plaintiff company seems to have been willing to remove all broken tile. They had some there for the purpose, and would have undoubtedly, if required to do so—if the company had notified them—have removed the broken tile and substituted whole ones which they had for that purpose.

"Perhaps I may be wrong, but I fail to remember any testimony that it would have rendered the tile useless to the defendant on account of its color. They could have been passed over all right—those things. The matter of the color and brittleness may be considered by you only with reference to whether or not the tile was of the best quality—whether or not that was any evidence that the tile was manufactured in such a manner that it would not expand so as to fill up those spaces between the tile. And that is the crucial point in this case. Did the tiling on those two ships expand so as to practically close those spaces between the blocks?

"In order to be of the best quality of material, manufacture, and workmanship, I charge you that it was necessary that it should do so. If it did that, the plaintiff in this case is entitled to recover; if it did not, the plaintiff is not entitled to recover. That, as I stated before, is the crucial point in the case. The burden of proof is upon the plaintiff to show that it did. If the plaintiff has not shown that by a pre-

ponderance of the testimony, then the plaintiff is not entitled to recover, and the defendant is entitled to recover. If the plaintiff has shown it, then it is entitled to recover the full amount of its claim, and the defendant will recover nothing on account of the claim of recoupment which it has put in."

Error is assigned upon the refusal of the court to give defendant's requests, also upon that part of the charge embraced in the parentheses.

1. The first point urged by appellant is that there can be no recovery for work not approved by the architects; and counsel cite *Hanley* v. *Walker*, 79 Mich. 607 (45 N. W. 57, 8 L. R. A. 207), and *Fisher* v. *Adding Machine Co.*, 166 Mich. 396-401 (132 N. W. 101). It will be noted that the contract did not require a formal certificate of approval. It provided:

"Terms 30 days net, after completion and approval by architect, and acceptance by this company."

Under the circumstances as detailed by the evidence, we think that it was a fair question for the jury whether the contract was performed by the plaintiff, and whether there was a rejection of the tiling before the boats were turned over to the owners. The defects complained of were obvious; and it has been held that if the defects are obvious, a failure to reject is equivalent to approval. 35 Cyc. p. 229, and cases cited. The approval of the architects could be waived by the defendant. In our opinion the cases cited by appellant are not controlling, but the real questions are:

(1) Was the contract substantially performed by the plaintiff?

(2) Did the defendant's conduct amount to a waiver of formal approval by the architects, and an acceptance of the tiling?

It is clear that acceptance may be express, or implied from circumstances, in such a case. The tiling

installed in these boats consisted of blocks about three inches across, of two shapes, which interlock with each other. The design was made by a combination of blocks of different colors. The laying of the tiling consisted in properly combining the colors to .form the designs, and fitting the blocks around the edges of the surface to be covered. The tiling was not fastened to the floor, and, after being laid, the whole, or any number of blocks, could be removed, and new blocks substituted in their stead. The undisputed evidence is that the plaintiff offered to remove the tiling if unsatisfactory, but this offer was refused by defendant, and the boats were turned over to the owners, who paid the contract price for them. We think it was a fair question for the jury whether, by its conduct, defendant did not accept the tiling, and waive its right to stand upon the claimed failure of the architects to approve. Bowers Law of Waiver, p. 29; *Brady* v. *Cassidy,* 145 N. Y. 171 (39 N. E. 814).

It was denied by plaintiff that there was any consent given that defendant might use the tiling during the running season, and leave the matter open until fall. It is manifest that there was no warranty intended to survive approval and acceptance. The following authorities are applicable: *Talbot Paving Co.* v. *Gorman,* 103 Mich. 403 (61 N. W. 655, 27 L. R. A. 96); *Eaton* v. *Gladwell,* 121 Mich. 444-452 (80 N. W. 292); *Buick Motor Co.* v. *Reid Manfg. Co.,* 150 Mich. 118 (113 N. W. 591); *Gill & Co.* v. *Gaslight Co.,* 172 Mich. 295 (137 N. W. 690); *Cheboygan Paper Co.* v. *Eichberg,* 184 Mich. 30 (150 N. W. 312); *Henderson Lumber Co.* v. *Stillwell & Co.,* 130 Mich. 124 (89 N. W. 718); *Wolf Co.* v. *Refrigerating Co.,* 252 Ill. 491 (96 N. E. 1063, 50 L. R. A. [N. S.] 808); *Orton* v. *Stone & Lime Works Co.,* 183 Ill. App. 370; *Kingman & Co.* v. *Watson,* 97 Wis. 596, 612 (73 N. W. 438), and cases cited; *J. Thompson Manfg.*

*Co.* v. *Gunderson,* 106 Wis. 449, 455 (82 N. W. 299, 49 L. R. A. 859).

2. Was there error in the refusal to give defendant's third and fourth requests to charge? If we are correct in what we have already said, and if the authorities referred to are applicable, defendant was not entitled to have the said requests given.

3. Was there error in failing to give the fifth and sixth requests? It is evident that the jury found that there was no breach of warranty, or of contract, and that there was approval and acceptance, or that there was a waiver of approval. At all events it appears that the jury gave a verdict for the full amount claimed by plaintiff, and did not reach the question of defendant's damages; they must therefore have found, either that the tiling and installation were as the contracts called for, and that there was approval and acceptance, or that the defects were waived. The matter of recoupment was therefore unimportant. *Buick Motor Co.* v. *Reid Manfg. Co., supra.* The subject, however, seems to have been fully covered by the charge of the court.

We have examined the charge with special reference to the portion upon which error is assigned. We find no error therein, and we are of opinion that the charge as a whole was as favorable to the defendant as could be reasonably asked.

Finding no reversible error in the record, the judgment of the circuit court is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.