**BURGE ICE MACHINE COMPANY, an Illinois Corporation, Appellant,**

v.

**George J. WEISS, Appellee.**

**George J. WEISS, Appellant,**

v.

**BURGE ICE MACHINE COMPANY, an Illinois Corporation, Appellee.**

Nos. 12131, 12132.

United States Court of Appeals, Sixth Circuit.

Feb. 17, 1955.

574

F. J. Schumann, Detroit, Mich. (Lucking, Van Auken & Schumann, Detroit, Mich., on the brief), for Burge Ice Machine Co.

Anthony A. Vermeulen, Detroit, Mich., for George J. Weiss.

Before ALLEN, MARTIN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This case arises out of an action for the balance alleged to be due upon the contract price of refrigeration equipment erected and installed by plaintiff[1] in an abattoir owned and leased by defendant to Division Packing Company. Defendant denied liability and filed a counterclaim for breach of contract. The agreed price of the work and equipment was alleged to be $25,061.05, of which $6,000 has been paid. The amended counterclaim prayed for judgment in the amount

1. The parties will be denominated as in the trial court.

of $150,000. The District Court entered a judgment of "no cause of action" against each party and each party filed an appeal.

### No. 12131

The contract provided that plaintiff should furnish and install refrigeration equipment for a proposed abattoir and storage plant. It further provided:

"After the plant is started we will furnish an engineer to have charge of its operation for 5 days, during which time we will do the work and produce the guaranteed results herein specified. While we are in charge you are to furnish all necessary help, together with fuel, light, water, steam, oil, waste and all other necessary supplies for the successful operation of this plant. At the end of the above mentioned 5 days you shall accept the plant, if it shall meet the requirements of this proposition. If at the end of the above mentioned 5 days any part or parts of the apparatus furnished by us shall fail to perform the guaranteed results, you shall give us written notice of such failure, and we shall then have a reasonable time in which to accomplish the results so guaranteed, or you permit us to enter the premises and remove our equipment without charge to you and upon refunding to you whatever money has been paid us. If we shall then within such reasonable time cause our apparatus to accomplish said guaranteed results, you shall accept the same and said acceptance shall be in full discharge of our agreements herein contained. It is further agreed, that if you shall use said apparatus for thirty days after it is started without giving us notice in writing of any failure or defect, such fact of itself shall be considered a final acceptance."

The principal contention of plaintiff was that defendant, by use of the equipment from January, 1948, until the time of trial, had accepted plaintiff's refrigeration system and could not bar recovery by plaintiff except by affirmatively proving that defendant had suffered damages to the full amount of the claimed recovery.

The District Court held that the contract was subject to an implied warranty of reasonable fitness for the slaughter of 150 head of cattle per day, which purpose was made known to plaintiff, and that defendant relied upon plaintiff's skill or judgment that the refrigeration system to be furnished would be reasonably fit for such purpose; that the contract was not modified, either orally or in writing; that the plaintiff failed to perform the contract in the following particulars and therefore could not recover the balance concededly due under the contract:

"A. It did not deliver and install its refrigeration system so that it was in operation on or about April 10, 1947.

"B. It did not install Niagara evaporators, as required by the contract. It installed, without obtaining the consent of the defendant, United States Air Conditioning units in both the sales cooler and the chill room, and, later, Marlowe units in the sales cooler.

"C. It never took charge of the plant for a period of five days to demonstrate the guaranteed results, nor did it at any time accomplish the successful operation of the refrigeration system.

"D. The system installed was never reasonably fit for beef slaughter refrigeration."

The District Court held correctly that the contract was subject to an implied warranty of reasonable fitness for the slaughter of 150 head of cattle per day. While defendant has always handled a large quantity of pork and other meat products besides beef, the item of capacity for cattle slaughtering was specifically made known to plaintiff.

Plaintiff urges that the contract is for labor and materials and not a sale

of goods, and hence is not subject to the implied warranty provision of the Michigan Sales Act, M.S.A. § 19.255(1), Comp.Laws 1948, § 440.15(1). This contention in a similar case was decided adversely to the plaintiff by the Supreme Court of Michigan. In Cox-James Co. v. Haskelite Manufacturing Corp., 255 Mich. 192, 237 N.W. 548, 549, an action brought for the purchase price of a waste conveyor system, it was contended that since the claim was for materials and labor the Uniform Sales Act did not apply. The court held that "The thing sold was a conveyor system supposed to perform a certain function," that the particular purpose for which the system was required was made known by the buyer to the seller, and that the buyer relied on the seller's skill and judgment. The court held that the case came clearly within the provisions of the Uniform Sales Act.

It is also contended that defendant, a person of extensive experience in the refrigeration of meats, made a contract which did not relate expressly to beef products, that he made his own selection of the system chosen, and did not rely upon plaintiff's skill and judgment. While it is true that defendant selected plaintiff's system after being offered one or, as his architect stated, two other systems, and had previously used Niagara evaporators, he was not a refrigeration expert. He informed plaintiff that he needed the system for the refrigeration of beef and the District Court's finding that he relied upon the skill and judgment of plaintiff, a long established refrigeration expert, is not clearly wrong. Cox-James Co. v. Haskelite Manufacturing Corp., supra; Dunn Road Machinery Co. v. Charlevoix Abstract & Engineering Co., 247 Mich. 398, 225 N.W. 592, 64 A.L.R. 947; Lutz v. Hill-Diesel Engine Co., 255 Mich. 98, 237 N.W. 546.

Defendant had no previous experience with plaintiff's system and was entitled to rely upon plaintiff's skill and judgment as a refrigeration specialist. M.S.A. § 19.255(1).

However, the court erred in certain respects in its construction of the contract, which does not provide an exclusive method of performance or acceptance and contains terms more elastic than was recognized by the court. The court erred in holding that plaintiff failed to perform the contract through delay in installation, which resulted in the system being placed in operation in January, 1948, instead of April, 1947. The contract did not provide unequivocally for delivery by March 1, 1947, nor for operation of the plant by April, 1947. The applicable provision reads as follows:

"On the basis of present conditions we will deliver the equipment on or before March 1st, 1947.

"As soon as any of the apparatus arrives on the premises we will set same in place and connect it up, this plant to be in operation about April 10th, 1947."

Thus the date on which the plant was to be in operation was made dependent upon the time of delivery of the equipment which in turn was dependent on the continuance of "present conditions." It was shown without contradiction that the particular Niagara evaporators specified in the contract were found to be subject to a delay in delivery of ten months or more. Certain important units were delivered in May, 1947, including the United States Air Conditioning evaporators substituted for the Niagaras. The brine spray unit was delivered July 12, 1947. However, defendant's plant was not then ready to receive the system. Defendant's architect Pine testified that the plant was ready around August or September, 1947. His certificate of completion of the building is dated January 31, 1948. A letter addressed to Pine by defendant dated February 4, 1948, complained that the hot water system did not yet function properly and also stated that water was coming into the building along the walls in the basement and from the roof. When Bishop, plaintiff's man in charge of installation, came to the plant in November, 1947, most of

plaintiff's equipment having then been delivered, construction and iron workers were still working in the killing room putting up hoists, etc., and Weiss was not then slaughtering. The refrigeration equipment was tested out by plaintiff without a load in November, 1947, and operation was begun January 6, 1948. These undisputed facts demonstrate that there was a change in the conditions existing when the contract was executed in 1946 affecting both delivery of equipment and beginning of operation, that a further delay resulted from the fact that defendant's plant was not ready. Plaintiff did not breach the contract in this respect.

■ The court also erred in finding that plaintiff breached the contract because of its substitution of United States Air Conditioning evaporators for the Niagara units originally specified and Marlo units later substituted in the sales cooler. The finding that defendant did not consent to this substitution is not sustained by the record. Parkhurst, plaintiff's chief engineer, who was in Detroit several days in February, 1948, testified explicitly that defendant did not object to the make of equipment delivered. All of the substituted evaporators bearing the brand name were received and receipted for by defendant's employees. Cunningham, refrigeration engineer for Division Packing Company, said he knew the make of the United States Air Blower unit, the United States Brine Spray unit and the United States Evaporator Condenser in January, 1948, by "the name plate." Numerous letters addressed by defendant and his attorney to plaintiff contained no objection to the substitution either of the United States Air Conditioning or of the Marlo units. As to the Marlo suspended type units substituted in October, 1948, Reilly, plaintiff's sales manager, talked with Weiss in Detroit about this substitution, which was necessary because of a leak in the United States Air Conditioning coil. At that time proceedings were under way to replace the United States Air Conditioning unit in the sales cooler.

Defendant discussed the suspended type units (the Marlos) with Reilly and mentioned the saving of floor space resulting from their use. Reilly assured defendant that there would be no extra cost for these units and defendant said, "All right, then." This conversation was not denied.

As to the substitution of the Marlo units for the United States Air Conditioning evaporators, the testimony of defendant's consent is conclusive. Defendant's attorneys in their letter of August 4, 1948, notified plaintiff that unless immediate steps were taken to install a proper refrigeration system defendant would be compelled to contract with another company. In the answering letter (August 6, 1948), plaintiff wrote defendant that it was installing two temporary cooling units in the salesroom to furnish service until "new units" could be secured "which we guarantee to handle this room." On August 12, 1948, defendant wrote plaintiff that the temporary refrigeration units were unsatisfactory and in answer to this letter plaintiff, August 16, 1948, wrote defendant that "shipment of the new units for the above is being made tomorrow." These Marlo units were installed and defendant's attorney in a letter dated October 19, 1948, said, "The refrigeration equipment which you replaced in the abattoir of the Division Packing Company is a great improvement over that which you formerly installed." While the letter again complained of claimed excessive drying and shrinkage of the meat, it acknowledged the receipt of the Marlo units and their operation to the better satisfaction of defendant. The written communication by defendant's attorney, read with the letter of plaintiff proposing securing of "new units," constituted a written assent to the substitution. The finding of the District Court upon this phase of the case was clearly wrong.

■ The failure of plaintiff to take charge of the plant for a period of five days, found by the court to be a breach of the contract, was not complained of by

defendant and was not mentioned in the pleadings. The complete failure of defendant to raise this point prior to trial constitutes waiver of performance of this feature of the contract.

█ The findings of the court that the system installed was never reasonably fit for beef slaughter refrigeration and that it never operated successfully are incorrect.

No testimony was introduced to the effect that the system was mechanically unfit to perform the purpose for which it was intended. The evaporator is the cooling unit of the room in which it is placed. The undisputed evidence showed that the crux of the matter as to the capacity of evaporators in refrigeration is the amount of total coil or cooling surface. The total coil surface of the Niagara units was 2,534 square feet and of the Marlo units was 3,072 square feet. Both the United States Air Conditioning units and the Marlo units had more cooling surface and more refrigeration capacity than the equipment described in the contract, and the Marlo units had more refrigeration capacity than the Niagara units. The brine spray unit installed had 50% more surface than the equipment of this same type originally described. These undisputed circumstances show that the present system was mechanically better than that called for in the contract.

The District Court confused reasonable fitness of the system with unsatisfactory operation. During the time from January 6, 1948, to the fall of the same year, when the Marlo units were substituted, the evidence showed faulty operation. Defendant from the start made certain complaints with reference to operation, reiterating that excessive drying and shrinkage of the meat existed. He also mentioned spoilage. The existence of excessive drying and shrinkage are somewhat incompatible with spoilage due, as claimed, to sliminess and excessive wetness. The first condition is due to over-circulation of the air and the second condition may be due to too great humidity and improper circulation. Witnesses, both for plaintiff and defendant, testified to this effect. Whether circulation is proper depends not only on equipment but upon careful operation. On this point it is significant that defendant in material particulars interfered with the operation of the system. When the United States Air Conditioning evaporator sprang a leak in the coils at a point where it was impossible to repair it without completely disassembling the unit plaintiff could not get a replacement from the factory for from two to six months and it was decided to substitute the Marlo units, of which defendant approved because they were suspended from the ceiling. Temporary units were placed in the system until the Marlo units could be secured. Meyer, a qualified engineer in charge of plaintiff's Detroit office and working on this problem for plaintiff, testified that defendant would shut the temporary units off and complain about them. Meyer said that whenever he was over there he usually turned the temporary units on "because it would give him [defendant] some refrigeration even though it wasn't adequate." He stated that these temporary units were used until the installation of the Marlo units "on and off . . . because many times I went in and found them shut off." This testimony is not disputed.

Plaintiff's engineer in charge of the installation did not give a competent performance. Plaintiff sent its chief engineer from Chicago on February 16, 1948, to deal with defendant's complaints. It was necessary in certain particulars to change the system in order to remedy the air distribution in the cooler room. Grills were installed replacing stampings. Pulleys, motors and thermostats were changed. After these alterations Bone, a competent refrigeration man in charge of defendant's abattoir, stated that by May, 1948, the "bugs" in the system had been corrected "to a reasonably good extent" but not 100%. Defendant had claimed that the meat in the cooler at

that time spoiled within three days. Bone said this was not the fact, that it would hold for from seven to ten days.

In June, 1948, the United States Air Conditioning unit in the salesroom sprang a leak. Plaintiff suggested replacement with 9 ceiling suspended Marlo units and, as set out above, this was consented to by defendant. Shortly after defendant's lawyer wrote that the substitution was "a great improvement." Jerome Weiss, defendant's son, manager of Division Packing Company, an interested and evasive witness, said that after this change the system operated "considerably better."

Meyer ran tests for plaintiff for relative humidities in the cooler for six days on January 24, 25, 26, 27, 28 and 31 of 1949. These readings were taken in the four corners of the cooler and in the center at about head level. The tests showed, Meyer said, that the conditions were as good, if not better, than the average conditions anywhere for ideal storage conditions. This, he said, was due to the fact that with proper temperature and humidity, refrigeration cannot possibly spoil the meat. The only other sources of spoilage are the handling of carcasses, the condition of air in the room, and the method of handling the meat on the slaughter floor affecting the condition of the beef on entering the chill room. Evidence that plant operation apart from refrigeration might affect the spoilage of beef was not only undisputed but it was thrown into high light for this case by the testimony of Prof. Lyman Bratzler of Michigan State College, an expert of 25 years experience in the handling of meat.

On November 19, 1951, November 21, 1951, and January 14, 1952, Prof. Bratzler inspected defendant's plant, viewing many carcasses in the cooler, and testified concerning 32 carcasses as to which he had made specific notes and as to which the tags showed when each individual carcass had been received in the cooling room. Prof. Bratzler's notes showed that in most cases conditions were normal in consideration of the hold-ing period. He testified to a few instances of sliminess, at least two of which resulted from the improper removal of glands and tissue. He found hides and filth under the splitting hoist and manure and filth on feet in the chill room. This was definite evidence of a condition in defendant's plant resulting in possible contamination and deterioration of the meat, not from refrigeration, but from what Prof. Bratzler called "poor housekeeping."

Defendant's plant during the entire period involved used plaintiff's equipment, which was the only refrigeration equipment in the plant.

The figure of 150 head of cattle set by defendant as the outside beef capacity of the plant per day was not reached. Evidence was adduced to the effect that the years in question were not good years for the beef industry. However, the record of the Detroit Board of Health showed for the year 1948 a total of 2,-487 cattle, for 1949, 3,020 cattle, for 1950, 2,919 cattle, and for seven months of 1951, 2,116 cattle slaughtered by Division Packing Company. The total volume of sales for the years 1948 to date of trial in 1951 was as follows:

| Year | Volume of Sales |
|---|---|
| 1948 | $ 645,000.36 |
| 1949 | 1,011,698.75 |
| 1950 | 947,486.57 |
| 1951 | 1,235,515.14 |

In his frequent letters defendant complained of great loss caused by faulty refrigeration through deterioration of the meat, describing the loss as "huge" or "tremendous." It was shown that there would always be some such loss in an abattoir and storage plant. The only definite evidence of the amount of loss is found in the records of the Detroit Board of Health. Witnesses for defendant testified generally as to odors in the chill room and sliminess of the meat, but with one exception do not give the length of time that the product described had been in the chill room. This is shown by tags attached to the carcass, but the tags were not quoted by these witnesses. The ex-

ception mentioned above, a carcass described by defendant's witness Du Mez, for instance, had been in the chill room two weeks. The records of the Detroit Board of Health cover in detail the years 1948, 1949, 1950 and seven months of 1951. In 1948, 4 cattle were condemned; 1949, 3 cattle were condemned; 1950, 2 cattle were condemned; for seven months of 1951 no cattle were condemned. The total weight of parts condemned for these four years amounted to about 7,000 pounds. Jerome Weiss stated that the loss was from 15,000 to 20,000 pounds. The official records show an average of less than one animal in a thousand condemned per year, and do not sustain the claim of "tremendous" losses. These figures do not show what part of the losses were due to refrigeration, what part to operation, and what part to contamination of the meat. Jerome Weiss repeatedly stated on cross-examination by the court that the Division Packing Company kept no record of animals claimed to have been sold at a loss because of deterioration in quality, and the District Court correctly found that defendant had not established its allegation of loss. Because of complete failure of proof of spoilage suffered, the District Court dismissed defendant's counterclaim; and yet it found that plaintiff's equipment used for several years was never fit for the purpose intended. The record does not show that deterioration which existed was due to faulty refrigeration, as opposed to faulty operation by defendant's employees. In view of the undisputed testimony as to the mechanical fitness of the equipment, and particularly of the Marlo evaporators, the lack of a record of loss, the statements made by three of defendant's employees, the refrigeration manager, the attorney, and Jerome Weiss, as to the improved and satisfactory operation after the fall of 1948, and the retention of the equipment from 1948 to date of trial in December, 1951, we conclude that the court's finding that the system installed was never reasonably fit for beef refrigeration is clearly wrong. Also, while at first the system did not operate well and required certain changes in equipment, the record shows that due to plaintiff's efforts there came a point when the equipment performed satisfactorily. This point is established to be around the early part of October, 1948. The retention of the system by defendant for so long a time after this date makes inevitable the conclusion that it operated substantially as the parties intended.

Moreover, the District Court erred in its application of the law with reference to acceptance of the refrigeration equipment and system. The Uniform Sales Act, M.S.A. § 19.288, Comp.Laws 1948, § 440.48, provides that "The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after a lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."

Defendant performed certain acts in relation to the equipment inconsistent with the seller's ownership. He handed over the use of it to a separate entity, Division Packing Company. This corporation, formed in June, 1947, was defendant's alter ego, defendant holding all the voting stock and a majority of all stock; the only other stockholders were his wife and son. During the busy years in which Division Packing Company handled several million dollars worth of meat products, according to its corporate minute books it held only three routine meetings. The corporation business was done by defendant and his son, Jerome Weiss, without benefit of corporate action.

It is undisputed that Division Packing Company, having possession of the equipment supplied by plaintiff, deducted depreciation upon its value for the purposes of income tax. Such a deduction was an unequivocal representation that the equipment belonged to defendant, was clearly inconsistent with ownership in plaintiff, and, apart from

the feature of acceptance by long continued user, constituted acceptance as a matter of law.

■ The trial court found that defendant demanded the removal of the equipment in December, 1948, and February, 1949. No such suggestion appears in nine of the ten detailed letters written plaintiff by defendant or his attorney. Such a demand was made by letter in the spring of 1948 as to the Sterling Compressor, but not repeated in the letters. Defendant and his son, Jerome Weiss, testified that at two conferences with Meyer in December, 1948, defendant made oral demand for the removal of the equipment. There is no evidence, either oral or written, of the demand found by the court to have been made in February, 1949. It is undisputed that the equipment was continuously used from December, 1948, to June 18, 1949, when this case was filed, and up to the time of trial, December, 1951. Under Michigan law, controlling here, this is an unreasonable period of retention and user and constitutes waiver of the rejection and acceptance as a matter of law. Defendant cannot retain plaintiff's system for such an extended period of time, selling millions of dollars worth of meat refrigerated in the system, and avoid liability upon the ground that it has not accepted the work and material delivered by plaintiff. Avery v. Burrall, 118 Mich. 672, 77 N.W. 272; Solomon v. Weiner, 188 Mich. 114, 153 N.W. 1058; Robertson & Wilson Scale & Supply Co. v. Richman, 212 Mich. 334, 180 N.W. 470; Matchless Electric Co. v. Morley Bros., 252 Mich. 144, 233 N. W. 202; Schwartz Showell Corp. v. Bonfiglio, 261 Mich. 407, 246 N.W. 162; Wanner v. Snider, 289 Mich. 464, 286 N. W. 685; Advance-Rumely Thresher Co., Inc., v. Wharton, 211 Iowa 264, 233 N. W. 673, 77 A.L.R. 1153; O. C. Barber Mining & Fertilizing Co. v. Brown Hoisting Machinery Co., 6 Cir., 258 F. 1; United States v. Lux Laundry Co., Inc., 7 Cir., 118 F.2d 848; 3 Williston on Sales, Section 483. In certain of these cases demand was made for removal and was held to be waived by continued retention or user after demand. In the Matchless Electric case, supra, the Supreme Court of Michigan held that, by conducting itself toward the goods in a manner inconsistent with the rejection, the buyer waived the rejection. The court stated [252 Mich. 144, 233 N.W. 203], "The case stands as though it [the rejection] had not been made." In the Robertson & Wilson Scale & Supply Co. case, supra [212 Mich. 334, 180 N.W. 473], the Supreme Court declared that defendant in fact never took out or stored the cooler as he threatened, but "kept, used, and, as a matter of law, accepted it." In Wolf Co. v. Monarch Refrigerating Co., 252 Ill. 491, 96 N.E. 1063, 50 L.R.A.,N.S., 808, relied upon by the Michigan court, Pennsylvania Rubber Co. v. Detroit Shipbuilding Co., 186 Mich. 305, 322, 152 N. W. 1071, as stating the law with reference to acceptance, the court assumed that the plant delivered did not meet the requirements of the specifications and that appellant in writing rejected the plant, but held that if appellant chose to retain and use the engine it thereby accepted the ownership of it, even though it had given sufficient notice in writing of the rejection. The court declared [252 Ill. 491, 96 N.E. 1067]: "it could not retain possession of the property and use it for its own profit in its business and at the same time insist upon the rejection." No Michigan cases to the contrary are cited.

■ It is argued that plaintiff was obligated under the contract to remove the equipment. The provision of the contract on this point is that, if defendant fails to secure the guaranteed results after written notice of such failure, plaintiff shall have a reasonable time in which to accomplish the results so guaranteed "or you permit us to enter the premises and remove our equipment without charge to you and upon refunding to you whatever money has been paid us." Under the express wording of the contract no obligation to re-

move is imposed on plaintiff. The contract permits, but does not order, removal. In any case, plaintiff's failure to remove the equipment does not invest defendant with the right to use it without compensation.

It follows that plaintiff's action for the purchase price was not barred. It was subject to recoupment in accordance with the evidence of damage actually incurred through breach of the contract, or breach of the warranty of reasonable fitness. M.S.A. § 19.309(1) (a), (b), Comp.Laws Mich. 1948, § 440.69(1) (a, b). But since no such evidence was introduced recoupment was not available. The judgment against plaintiff on the complaint is reversed and the case is remanded to the District Court for further proceedings in accordance with this opinion.

### No. 12132

With reference to defendant's cross-appeal, No. 12,132, it is not necessary to discuss the facts at length. In spite of the repeated complaints of "huge" losses made by defendant, not one written record was produced to substantiate the complaints. The District Court called the attention of Jerome Weiss to the fact that there was a steady increase in defendant's beef business during the years, 1949, 1950, and 1951. The court repeatedly asked for documentary proof of the loss of beef by spoilage and was told that there were no records. The court called attention to the fact that on May 19, 1949, the minute book of Division Packing Company stated that the refrigeration system could not be removed for the reason that defendant expected litigation with plaintiff and said, "being litigation conscious, yet it is your testimony now you made no record of these losses?" The continued answer was that there was no record.

The claimed loss of rents was not established. The rents were contracted for by defendant with himself through Division Packing Company. No loss was established from failure to receive the maximum rent from defendant's alter ego. Moreover, the lease which contained the agreement of rent and salaries to be paid defendant, his son, and his wife, was executed subsequently to the contract accepted by defendant November 20, 1946, and approved by plaintiff December 14, 1946. The lease was dated June 20, 1947. This being the case, under Michigan law loss of rentals under the lease was not within the contemplation of the parties. It was a collateral contract under which defendant could not recover damages for loss of profits because the collateral contract was not in existence at the time the sales contract was made. Wetmore v. Pattison, 45 Mich. 439, 8 N.W. 67, cited with approval, Frederick v. Hilldebrand, 199 Mich. 333, 165 N.W. 810; 88 A.L.R. 1467, and cases cited. Cf. Scottish Union & National Ins. Co. v. Bejcy, 6 Cir., 201 F.2d 163, 37 A.L.R.2d 534.

The $6,000 paid by defendant upon the contract could not be recovered in view of its use and acceptance of the equipment as set forth in Case 12131. There was no error in the court's allocation of costs. Under Federal Rules of Civil Procedure, rule 54(d), 28 U.S. C.A., costs are discretionary in the trial court and this discretion was not abused. The judgment of the District Court upon the counterclaim is correct and is affirmed.